# United States Court of Appeals
## For the First Circuit

Nos. 03-1691 and 03-1798

PACIFIC INSURANCE COMPANY, LIMITED,

Plaintiff, Appellant/Cross-Appellee,

v.

EATON VANCE MANAGEMENT,

Defendant, Appellee/Cross-Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Howard, Circuit Judge,

Coffin and Campbell, Senior Circuit Judges.

Harvey Weiner with whom Barry D. Ramsdell and Peabody & Arnold LLP were on brief, for appellant.
Jeffrey B. Maletta with whom Aimée E. Bierman and Kirkpatrick & Lockhart LLP were on brief, for appellee.

May 27, 2004

**HOWARD**, **Circuit Judge**. These cross-appeals arise out of an indemnification dispute between an employer and its insurer. The principal issue is whether the employer must be indemnified for certain belated contributions it made to the profit-sharing accounts of various subsidiary employees. Upon determining that these payments (and certain other amounts) were covered by the relevant policy, the district court granted the employer's motion for summary judgment in the amount of $1,015,138.94 and denied the insurer's cross-motion for summary judgment seeking a declaration of no coverage under the policy. See Pacific Ins. Co. v. Eaton Vance Mgmt., 260 F. Supp. 2d 236 (D. Mass. Aug. 14, 2002); Pacific Ins. Co. v. Eaton Vance Mgmt., 260 F. Supp. 2d 334 (D. Mass. April 30, 2003). We reverse in part, vacate in part, and remand.

## I.

The relevant facts having been twice reported, see id., we confine ourselves to the essentials.

### A. The Plan

Since the 1950s, Eaton Vance Management ("Eaton Vance")[1] and its predecessors have operated a qualified profit-sharing plan ("Plan")[2] for their employees. Annual contributions to the Plan

---

[1]Eaton Vance is a Massachusetts business trust, with its principal place of business in Boston.

[2]The Internal Revenue Service ("IRS") reviewed the Plan and deemed it "qualified," with the result that Eaton Vance may deduct any contributions made to it.

are discretionary and, if made, are derived from Eaton Vance's profits in a given fiscal year. Of particular importance are the Plan's employee-eligibility criteria.

Prior to November 1984, employees of Eaton Vance's subsidiaries were not included in the Plan unless the respective subsidiary expressly adopted the Plan by written resolution.[3] In July 1986, Eaton Vance adopted new Plan documents -- effective November 1, 1984 ("1984 documents") -- that allegedly broadened the Plan's eligibility criteria to include automatically subsidiary employees unless specifically excluded. Supplying our own emphasis to language that significantly differs from, or adds to, language in the prior governing documents, see supra n.3, the 1984 documents provide in pertinent part:

> The term employee includes: (a) any common-law employee of the employer . . . .
>
> "Employer" means the employer named in the last section of the adoption agreement, <u>any commonly controlled organization</u>, and any predecessor organization . . . .
>
> An employee ordinarily becomes an active participant on his entry date. However, there are three exceptions: . . . (c) An employee is not an active participant during any period in which he is not an employee in an eligible class.

---

[3]Specifically, the governing documents defined "employee" as "any employee of the employer" and defined "employer" as "the employer named in the Adoption Agreement" (<u>i.e.</u>, Eaton Vance) and "any predecessor organization." The documents also provided that "a commonly controlled organization may join the employer in adopting this plan . . . by [adopting] a written resolution."

> An employee is in an eligible class unless: [he falls within one of four exceptions not germane to this appeal].
>
> Subject to the rules of this article, a commonly controlled organization may join the principal employer [Eaton Vance] in adopting this plan. <u>A commonly controlled organization with any employees eligible must join the principal employer in adopting this plan.</u> No other organization may do so.
>
> An organization joins by a written resolution . . . .

It is uncontested that, despite its adoption of the 1984 documents, Eaton Vance management was unaware of the change in language.

Because Eaton Vance did not intend to broaden the eligibility criteria (<u>i.e.</u>, it continued to believe that a subsidiary's affirmative adoption of the Plan was a condition precedent to the subsidiary's employees' eligibility), it continued to operate the Plan as it had prior to the adoption of the 1984 documents and treated as participants only those employees of those subsidiaries that had expressly adopted the Plan. Accordingly, it did not automatically establish accounts in the names of all subsidiary employees. Nor did it specifically exclude them from the Plan or provide them with information regarding the Plan.

**B. The Claim Against Eaton Vance**

On February 2, 1999, Wilfredo Hernandez, then an employee of an Eaton Vance subsidiary (Compass Management, Inc.), sent to Eaton Vance a letter indicating that money due him under the Plan had not been deposited into his account. Upon receiving this

letter, Eaton Vance contacted its outside ERISA counsel for an evaluation of Hernandez's claim. Although Compass had not adopted the Plan by written resolution, outside counsel advised Eaton Vance that, due to the plain language of the 1984 documents, Hernandez likely would be successful if he chose to litigate. Further, counsel warned Eaton Vance that there would be serious tax consequences if the IRS discovered that the Plan had not been administered according to its terms. Eaton Vance thereafter adopted counsel's advice and has since steadfastly maintained -- both before the district court and on appeal -- that the 1984 documents were worded so as to cover Hernandez and other similarly situated employees.

On April 28, 1999, outside ERISA counsel sent to Hernandez's attorney a letter acknowledging that Eaton Vance should have recognized Hernandez and other "similarly affected participants" as Plan participants. The letter also stated that Eaton Vance would fund those accounts at the level they would have been funded had the employees been recognized as participants all along.[4]

---

[4]In October 1999, Eaton Vance revised the plan language (effective November 1, 1998) to reaffirm its intention that employees of subsidiaries are not included in the Plan unless the Plan has been adopted by written resolution of the subsidiary.

## C. The Insurance Policy

Back in 1998, Pacific Insurance Company ("Pacific") had issued to Eaton Vance a Mutual Fund Errors and Omission Policy ("Policy") effective from August 1, 1997, to August 1, 1999. The Policy provided coverage for

> [l]oss or liability incurred by [Eaton Vance], from any claim made against [Eaton Vance] during the Endorsement Period, by reason of any actual or alleged failure to discharge his or its duties or to act prudently within the meaning of the Employee Retirement Income Security Act of 1974 ["ERISA"] . . ., or by reason of any actual or alleged breach of fiduciary responsibility within the meaning of said Act . . . in [Eaton Vance's] capacity as a fiduciary with respect to any pension or employee plan or trust.

## D. The Notification & The Funding of Overdue Accounts

By letter dated June 18, 1999, Eaton Vance notified Pacific of the Hernandez claim. Pacific thereafter responded with a letter acknowledging receipt of Eaton Vance's letter. Subsequently, Eaton Vance asked Pacific to agree to a filing with the IRS under the Voluntary Compliance Review ("VCR") program. (This filing had been proposed by outside ERISA counsel as a means to end Eaton Vance's exposure to governmental penalties for noncompliance with the 1984 documents.) Pacific acknowledged this request but "before consenting to this action" urged Eaton Vance to consider withholding any additional contributions to the Plan. Pacific further stated that it was "reserv[ing] its rights" and

advised Eaton Vance "to take whatever action [it] deems appropriate to protect Eaton Vance including the filing of a VCR application."

The VCR application ultimately was filed with, and approved by, the IRS. Although Hernandez had been the only party to make a claim under the Plan, Eaton Vance thereafter established accounts for a total of forty-nine employees and contributed $880,869.86 to those accounts (representing the amount -- principal and interest -- needed to fund the accounts to the level they would have attained had Eaton Vance timely contributed).

**E. The Litigation**

On June 8, 2000, Pacific filed a diversity action in the District of Massachusetts seeking a declaratory judgment of no coverage under the Policy. See 28 U.S.C. §§ 1332 and 2201. Specifically, Pacific alleged, inter alia, that (1) Eaton Vance did not breach its fiduciary duties or fail to discharge its duties or act prudently within the meaning of ERISA; (2) the obligation to make payments is not due "by reason of" a breach of fiduciary responsibility or "by reason of" a failure of Eaton Vance to discharge its duties; and, (3) even if there is coverage under the Policy, a $1,000 per claim deductible exists for each excluded employee. Eaton Vance counterclaimed, alleging that the Policy covered its liabilities. Eventually, both parties moved for summary judgment.

On August 14, 2002, the district court entered summary judgment for Eaton Vance upon determining, <u>inter alia</u>, that (1) Eaton Vance had breached its fiduciary duty under ERISA; and (2) Eaton Vance's liability to the excluded employees was caused by this breach. See <u>Pacific Ins. Co.</u>, 260 F. Supp. 2d at 241-44. The court did find, however, that there existed a $1,000 deductible for each employee's claim; accordingly, it granted summary judgment to Pacific on this issue. See <u>id.</u> at 247-48. Finally, on April 30, 2003, Pacific was ordered to pay Eaton Vance $1,015,138.94.[5] <u>See Pacific Ins. Co.</u>, 260 F. Supp. 2d at 346-47.

These cross-appeals followed.

## II.

### A. Standards of Review

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling

---

[5]This amount was calculated as follows: **$880,869.86** (the amount -- principal and interest -- that Eaton Vance paid to fund the employees' accounts) **- $49,000** (the Policy's deductible) **+ $148,876.28** (the prejudgment interest on the $880,869.86) **+ $12,537.00** (the defense and investigation costs incurred prior to the date on which Eaton Vance notified Pacific of Hernandez's claim) **+ $5,787.16** (the prejudgment interest on the $12,537) **+ $13,100.57** (the prejudgment interest on the post-notification costs that belatedly were reimbursed by Pacific) **+ $2,968.07** (the costs for deposition transcripts).

on the motion, the district court must view "the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." Barbour v. Dynamics Research Corp., 63 F.3d 32, 36 (1st Cir. 1995). And, of course, "[t]he standards are the same where, as here, both parties have moved for summary judgment." Bienkowski v. Northeastern Univ., 285 F.3d 138, 140 (1st Cir. 2002) (citing 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2720, at 335-36 (3d ed. 1998) ("The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.")). The district court's rulings on the cross-motions for summary judgment are reviewed de novo. See Calero-Cerezo v. U.S. Dept. of Justice, 355 F.3d 6, 19 (1st Cir. 2004) (citations omitted).

## B. Analysis

In order for Pacific to be held liable under the Policy, Eaton Vance must have incurred a (1) "loss or liability" (2) "by reason of" (3) "any actual or alleged failure to discharge . . . its duties or to act prudently within the meaning of . . . ERISA . . . or by reason of any actual or alleged breach of fiduciary responsibility within the meaning of [ERISA]." As already stated, the district court determined that coverage existed under the Policy because each element was satisfied. Without

necessarily opining on whether the facts of this case implicate either the first or third prong, we turn directly to a discussion of the second.

"[B]y reason of" is not defined in the Policy; accordingly, if the language were ambiguous, we normally would consider whether the phrase should be construed in favor of Eaton Vance. See Cody v. Conn. Gen. Life Ins. Co., 439 N.E.2d 234, 237 (Mass. 1982) ("[I]f the contract is ambiguous, doubts as to the meaning of the words must be resolved against the insurance company that employed them and in favor of the insured." (citations and internal quotation marks omitted)); F.D.I.C. v. Ins. Co. of North Am., 105 F.3d 778, 786-87 (1st Cir. 1997) (applying Massachusetts law and noting that the presumption against the insurer does not apply "where the policy language results from the bargaining between sophisticated commercial parties of similar bargaining power" (citation omitted)).

Here, however, we need not reach the contra proferentem issue because we consider the language unambiguous: "by reason of" means "because of," Black's Law Dictionary 201 (6th ed. 1990), and thus necessitates an analysis at least approximating a "but-for" causation test. Cf. United States v. Rosa-Ortiz, 348 F.3d 33, 38 (1st Cir. 2003) ("The statutory phrase 'by virtue of,' by its plain meaning, suggests a but-for causation test." (citing Webster's Third New Int'l Dictionary 307 (defining "by virtue of" to mean "by

-10-

reason of"))); <u>Three Sons, Inc.</u> v. <u>Phoenix Ins. Co.</u>, 257 N.E.2d 774, 776 (Mass. 1970) ("The words 'liability imposed . . . <u>by reason of</u> any statute,' clearly imports a <u>direct causal relation</u> between the fact of liability and the violation of a statute. To qualify for this exclusion, liability must directly result from the violation of the statute . . . ." (emphases added)). We therefore reject Eaton Vance's assertion that "'by reason of' . . . is a more generous standard that extends coverage beyond the strict 'but-for' test Pacific seems to be applying."[6] <u>See</u> <u>Cody</u>, 439 N.E.2d at 237 ("A policy of insurance whose provisions are plainly and definitely expressed in appropriate language must be enforced in accordance with its terms." (citations and quotation marks omitted)).

Having defined the relevant language, we next consider whether Eaton Vance's liability to the employees falls within the Policy's scope. Eaton Vance argues that, even under a restrictive reading of the Policy's causation element, coverage exists because (1) the cause of Eaton Vance's liability was "its failure to administer the Plan in accordance with the 1984 Plan Documents by identifying the proper participants [<u>i.e.</u>, Hernandez and other similarly situated employees] and establishing and funding accounts for them when contributions were made"; (2) "this failure was a

---

[6]The authorities that Eaton Vance cites for support (a Tennessee Supreme Court case and a piece in an insurance journal) are not directly on point because they deal with construction of the phrase "arising out of" rather than the "by-reason-of" language at issue here.

-11-

breach of Eaton Vance's fiduciary obligations"; and that (3) "[o]nce [this breach] occurred, no intervention from any other force was required to bring about the liability."  Presented with a similar argument,[7] the district court agreed with Eaton Vance: "[The] failure to read the 1984 Plan Documents closely enough to see that the scope of the Plan had changed was . . . a breach of fiduciary duty which resulted in <u>Hernandez's account not being funded</u>."  <u>Pacific Ins. Co.</u>, 260 F. Supp. 2d at 244 (emphasis added).

Having had the benefit of additional briefing and oral argument on this tricky issue, we arrive at a different conclusion. As we see it, the relevant liability for which Eaton Vance seeks recovery from its insurer is <u>not</u> one for breach of fiduciary duty relative to the belatedly funded employee accounts; rather, Eaton Vance seeks reimbursement for amounts it paid -- principal and interest -- in satisfaction of its Plan-created obligation to establish and fund those accounts to the level they would have attained had Eaton Vance initially complied with the Plan.  So

---

[7]Specifically, Eaton Vance argued that

> simply signing the 1984 Plan documents did not proximately cause Hernandez's account to be unfunded[;] [r]ather, the cause of <u>Hernandez's unfunded account</u> was that Eaton Vance did not administer the Plan in accordance with its terms, which is a breach of fiduciary duty under ERISA that is covered by the Policy.

<u>Pacific Ins. Co.</u>, 260 F. Supp. 2d at 243-44 (emphasis added).

-12-

understood, the cause of this obligation cannot be the breach of the obligation; instead, in our view, this obligation derived from the broadened eligibility criteria in the 1984 documents themselves (as now interpreted by Eaton Vance), management's discretionary decision to fund, and the employees' concomitant entitlement to interest that would have accrued in their profit-sharing accounts had Eaton Vance acted in accordance with the Plan by establishing and funding the accounts.[8]   See, e.g., American Cas. Co. of

---

[8]The interest at issue here is, essentially, the prejudgment interest that a court might have awarded Hernandez and others had they elected to litigate their claims for payment of benefits due under the Plan. Cf. Cottrill v. Sparrow, Johnson & Ursillo, Inc., 100 F.3d 220, 223-24 (1st Cir. 1996) ("In ERISA cases the district court may grant prejudgment interest in its discretion to prevailing fiduciaries, beneficiaries, or plan participants. . . . Ordinarily a cause of action under ERISA and prejudgment interest on a plan participant's claim both accrue when a fiduciary denies a participant's benefits. . . . Setting the accrual date in this manner not only advances the general purposes of prejudgment interest . . . but also serves ERISA's remedial objectives by making a participant whole for the period during which the fiduciary withholds money legally due. . . . Figuring the accrual date in this way also prevents unjust enrichment." (citations omitted)).  Accordingly, as we see it, the interest portion of the $880,869.86 is part and parcel of what is due the employees under the Plan and, as such, is not a liability incurred by reason of a breach of fiduciary duty.

The result we reach makes sense from a policy perspective as well.  Because Eaton Vance wrongfully withheld the principal, it presumably was able to earn interest on these monies -- interest that otherwise would have been earned by the employees on their accounts. As such, the interest represents benefits to Eaton Vance on monies wrongfully withheld.  If we were to hold that the Policy covers these amounts, Eaton Vance would reap a substantial windfall.  This result would create a perverse incentive for employers negligently to delay contributions while retaining the monies in an interest-earning account safe in the belief that any interest earned would be theirs to keep.

In any event, Eaton Vance made no significant effort -- either

-13-

Reading, Pa. v. Hotel & Rest. Employees & Bartenders Int'l Union Welfare Fund, 942 P.2d 172, 176-77 (Nev. 1997) ("The refusal to pay an obligation simply is not the cause of the obligation, and the [insured's] wrongful act in this case did not result in their obligation to pay; [its] contract imposed on [it] the obligation to pay.").

Whether or not Eaton Vance breached its fiduciary duties under ERISA by initially failing to administer the Plan in timely accordance with its terms is thus of no import to the relevant causation inquiry because the underlying obligation for which reimbursement is sought existed regardless of whether Eaton Vance first complied with its fiduciary duties or breached them. Accordingly, we must also reject Eaton Vance's alternative argument that the asserted breach of fiduciary duty was a concurrent cause of the obligation. See 7 G. Couch, Couch on Insurance § 101:57 (3d ed. 1997) ("The concurrent cause rule . . . takes the approach that coverage should be allowed whenever two or more causes do appreciably contribute to the loss, and at least one of the causes is an included risk under the policy.").

---

before us or before the district court -- to argue that, even if the principal payments are not covered under the Policy, the interest should be covered. Cf. United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[W]e see no reason to abandon the settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

-14-

As we understand the situation, the difference between what did happen (the belated funding of the accounts) and what should have happened (the timely funding of the accounts) is only one of timing: because Eaton Vance's management failed to read the 1984 documents prior to receiving the Hernandez letter, management became <u>aware</u> of the company's liability to the accounts later than it otherwise would have. Eaton Vance essentially argues this same point in its brief: "Had Eaton Vance administered the Plan according to its terms during each affected year, the omitted participants would have had funded accounts at the time they came to seek benefits."

But the fact that the alleged breach of fiduciary duty resulted in the late payment of funds does not alter the essential fact that the liability was "incurred . . . by reason of" the adoption of the 1984 documents, management's discretionary decision to fund the accounts of eligible employees, and the employees' entitlement to the interest that would have accrued in their profit-sharing accounts had Eaton Vance established and funded the accounts as required by the Plan. The insurance policy at issue covers debts "incurred . . . by reason of," <u>inter alia</u>, a breach of fiduciary duty; it does not cover debts that are "incurred" through a contractual obligation although belatedly paid because of a breach of fiduciary duty.

As indicated above, Eaton Vance admits that Hernandez and other similarly situated employees were, pursuant to the 1984 documents, automatically covered unless specifically excluded. Indeed, the company acknowledges as much in its brief to this court. There, in arguing that it breached its fiduciary duty under ERISA, Eaton Vance concedes that "[t]he governing Plan documents <u>by their terms</u> made all employees of the 'employer' -- Eaton Vance and its commonly controlled organizations -- Plan participants." (emphasis added). Effectively, then, Eaton Vance asserts that the 1984 documents established eligibility so as to render Eaton Vance's failure to fund (in years in which funding was authorized) a breach of fiduciary duty while at the same time arguing that, for purposes of the Policy, the resulting obligation was incurred by reasons other than the 1984 documents (and management's decision to fund in the relevant years). Eaton Vance cannot have it both ways.

Would we have reached the same result had the employees' claims wound up in litigation? While not intuitively obvious, the answer is yes. This hypothetical lawsuit might have alleged several theories of liability: for example, (1) breach of Plan documents; (2) breach of fiduciary duties under ERISA; and (3) failure to discharge duties or to act prudently within the meaning of ERISA. Perhaps Pacific would have associated with Eaton Vance

-16-

in defending this lawsuit,[9] which -- if Eaton Vance's outside ERISA counsel is to be believed -- Hernandez might well have won.

But, in this hypothetical situation, the possibility that Hernandez could have prevailed on one or more of his theories does not end our analysis.  Given the underlying facts surrounding the Hernandez claim, any judgment for Hernandez for <u>back-payment of benefits wrongfully withheld under the Plan (and the hypothesized amount-of-return thereon</u>) necessarily would be derivative of a finding that the Plan documents themselves (together with management's discretionary decision to fund) created the underlying financial obligation on which Hernandez sought performance -- performance that was due Hernandez prior to, and irrespective of, the lawsuit.  Accordingly, the Policy's causation requirement -- "liability incurred . . . by reason of any actual or alleged

---

[9]The Policy provides, in relevant part, as follows:

Coverage hereunder is extended to pay on behalf of [Eaton Vance] . . . all: . . .

DEFENSE EXPENSES

EE.  Costs and expenses incurred in the investigation or defense of any claim for which coverage is provided hereunder.

CONDITIONS

C-1.  SETTLEMENT:

It shall be the duty of [Eaton Vance], and not [Pacific], to defend claims. [Pacific] may, at its own expense, but is not obligated to, associate with any Insured in the investigation, defense or settlement of any claim . . . .

failure to discharge his or its duties or to act prudently within the meaning of [ERISA] . . ., or by reason of any actual or alleged breach of fiduciary responsibility within the meaning of said Act" -- would remain unsatisfied because the at-issue liability[10] would have been incurred by reason of something other than the listed contingencies.[11]

The Seventh Circuit faced a similar situation in Baylor Heating & Air Conditioning, Inc. v. Federated Mut. Ins. Co., 987 F.2d 415 (7th Cir. 1993). There, mistakenly believing that it had no liability under a collective bargaining agreement, the employer intentionally decided not to make payments to an employee pension fund. After the fund was successful in its suit against the employer for payment of the withheld benefits, the employer sued its insurer for the value of the unpaid benefits, which allegedly were insured under a liability policy.[12] The Baylor court denied

_____

[10]The liability at issue would have been Eaton Vance's liability to Hernandez for his share of the $880,869.86, which represents the amount -- principal and interest -- that Eaton Vance belatedly contributed to the accounts of the excluded employees.

[11]However, if, for example, a group of hypothetical Plan participants had been successful in a class action against Eaton Vance (as trustee of the Plan) for damages stemming from the trustee's failure prudently to invest the assets that properly had been deposited into participants' accounts pursuant to the Plan, Eaton Vance presumably would have had a claim under the Policy.

[12]Despite Pacific's assertion that Baylor was "conceptually identical" to this case, Eaton Vance makes no attempt meaningfully to distinguish Baylor. In its brief, Eaton Vance says only that "[t]he discretionary nature of contributions [in this case] distinguishes [Baylor], which involved mandatory contributions

-18-

coverage, explaining that the judgment against the employer for pension-fund amounts due under a collective bargaining agreement was not an "injury or damage caused by any negligent act, error, or omission in the administration" of the program:

> [The employer's] liability to the pension fund is contractual. Although at the time [the employer] refused to make fund payments it did not believe it had any contractual obligation to do so, these beliefs do not change the contractual nature of the obligation. The Fund was awarded amounts owed pursuant to the collective bargaining agreement, not damages for negligence, and these payments are not covered by [the employer's] policy.
>
> . . .
>
> Under [the employer's] logic, any default arising from a mistaken assumption regarding one's contractual liability could be transformed into an insured event. Indeed, refusing to pay a debt in reliance upon erroneous advice of counsel would convert a contractual debt into damage arising from a negligent omission. We dare not imagine the creative legal theories treading just short of malpractice and frivolity that could seek to transform contractual obligations into insured events.

987 F.2d at 419-20.[13]

---

under a collective bargaining agreement." We do not see why this distinction should impact our analysis.

[13]Similarly, in Oktibbeha County Sch. Dist. v. Corregis Ins. Co., 173 F. Supp. 2d 541, 543 (N.D. Miss. 2001), the district court reasoned as follows:

> The school district had a duty to pay overtime compensation because of the statutory requirements of the [Fair Labor Standards Act], not because of any wrongful act or omission of the school district. The school

We agree with the Seventh Circuit. It makes no sense to permit a dereliction in duty to transform an uninsured liability into an insured event. Cf. May Dept. Stores Co. v. Fed. Ins. Co., 305 F.3d 597, 601 (7th Cir. 2002) (Posner, J.) ("It would be passing strange for an insurance company to insure a pension plan (and its sponsor) against an underpayment of benefits, not only because of the enormous and unpredictable liability to which a claim for benefits on behalf of participants in or beneficiaries of a pension plan of a major employer could give rise, but also because of the acute moral hazard problem that such coverage would create. . . . Such insurance would give the plan and its sponsor an incentive to adopt aggressive (just short of willful) interpretations of ERISA designed to minimize the benefits due, safe in the belief that if, as would be likely, the interpretations were rejected by the courts, the insurance company would pick up the tab. Heads I win, tails you lose.").[14]

---

district had a pre-existing obligation to pay these employees for the overtime hours worked, an obligation that was created by the FLSA. The policy states that coverage will issue only if the school district suffered a loss by reason of a wrongful act. The duty to pay overtime is a matter of statutory law, and the obligation to pay time and a half for every hour worked over a forty hour week arose when the employees worked overtime hours.

[14]We are aware that the policy at issue in May Department Stores specifically excluded from coverage "benefits due or to become due under the [Plan]." This fact, however, does not undermine the persuasiveness of the analysis quoted in the text.

**III.**

For these reasons, we conclude that the district court erred (1) when -- based upon an incorrect finding that the Policy covered Eaton Vance's obligation to fund the relevant profit-sharing accounts -- it held that Eaton Vance was entitled to summary judgment for indemnification of amounts contributed to these accounts (and prejudgment interest thereon),[15] and (2) when it denied Pacific's cross-motion for a summary-judgment declaration of no coverage for these amounts.[16]  The court's judgment is therefore **reversed in part**.  Because we are unable to discern the extent to which these errors influenced the district court's determination that Pacific also was liable for certain amounts peripheral to the funding of the accounts,[17] the judgment is **vacated in part** and **remanded** so that the court can determine, in the first

---

[15]These amounts total **$980,746.14**: $880,869.86 + $148,876.28 - $49,000.  See supra n.5.

[16]Because we conclude that no coverage exists under the Policy for these amounts, we do not reach Eaton Vance's cross-appeal. That appeal challenges the district court's grant of summary judgment for Pacific on the separate issue of the Policy's deductible, which became relevant as a result of the district court's disposition of the coverage issue.

[17]These amounts total **$34,392.80**: $12,537.00 (the defense and investigation costs incurred prior to the date on which Eaton Vance notified Pacific of Hernandez's claim) + $5,787.16 (the prejudgment interest on the $12,537) + $13,100.57 (the prejudgment interest on the post-notification costs that belatedly were reimbursed by Pacific) + $2,968.07 (the costs for deposition transcripts).  See supra n.5.

instance, whether Eaton Vance remains entitled to these amounts in light of this opinion.  Each party shall bear its own costs.

**It is so ordered.**